# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

SHERILYN MATTISON
             **Plaintiff,**

             v.                                          **Case No. 09-C-60**

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration
             Defendant.

---

## DECISION AND ORDER

Plaintiff Sherilyn Mattison served in the military from 1980 to 1983, then worked at the post office from 1983 to 2003, at which point she took early retirement. (Tr. at 98-99; 116; 124-25; 137; 175; 324; 767.) Plaintiff then applied for social security disability benefits, claiming that she could no longer work due to mental health problems, including depression, anxiety and panic attacks, and physical problems, including pain in her hands, arms and back. The Social Security Administration ("SSA") denied the application initially and on reconsideration (Tr. at 38-39), as did an Administrative Law Judge ("ALJ") following a hearing (Tr. at 20-33). When the SSA's Appeals Council denied plaintiff's request for review (Tr. at 7), the ALJ's decision became the agency's final ruling on the application. See Liskowitz v. Astrue, 559 F.3d 736, 739 (7th Cir. 2009).

Plaintiff now seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g). Most of plaintiff's arguments lack merit. However, on one issue I am compelled to remand to the SSA for further proceedings.

# I. APPLICABLE LEGAL STANDARDS

## A.    Judicial Review

Judicial review of an ALJ's decision under § 405(g) is limited to determining whether the decision is supported by "substantial evidence" and consistent with applicable law. See, e.g., Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009); Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support the decision. Ketelboeter v. Astrue, 550 F.3d 620, 624 (7th Cir. 2008). Thus, if the record contains conflicting evidence that would allow reasonable people to differ as to whether the claimant is disabled, the responsibility for that decision rests with the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir.1997). The court may not re-weigh the evidence, resolve evidentiary conflicts, decide questions of credibility, or substitute its judgment for the ALJ's. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).

This does not mean that the court acts as an "uncritical rubber stamp." Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984). The court must review the entire record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision, Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005), and must ensure not only that the decision has adequate support in the record but also that the ALJ built an accurate and logical bridge between the evidence and the result, Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003). In analyzing the ALJ's articulation of the grounds for her decision, the court must "give the opinion a commonsensical reading rather than nitpicking at it." Johnson v. Apfel, 189 F.3d 561, 564 (7th Cir. 1999).

Finally, the court reviews conclusions of law de novo, Craft v. Astrue, 539 F.3d 668, 673

2

(7th Cir. 2008), and accordingly may reverse based on legal error "without regard to the volume of evidence in support of the factual findings," Binion, 108 F.3d at 782. The ALJ commits legal an error if she fails to comply with the SSA's regulations and rulings for evaluating disability claims. See, e.g., Golembiewski v. Barnhart, 382 F.3d 721, 724 (7th Cir. 2004); Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991). However, because the harmless error doctrine applies in review of social security decisions, the court need not remand if it is satisfied that the error did not affect the outcome. See, e.g., Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003).

B.    **Disability Standard**

The SSA determines disability pursuant to a sequential, five-step test, pursuant to which the ALJ asks:

(1) Is the claimant working?

(2) If not, does she suffer from a severe, medically determinable impairment?[1]

(3) If so, are any of these impairments considered presumptively disabling under SSA regulations?[2]

─────────────────

[1]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

[2]If the claimant suffers from such an impairment, she is considered disabled without further evaluation of her ability to work. See, e.g., Williams v. Apfel, 48 F. Supp. 2d 819, 824 (N.D. Ill. 1999). The SSA has compiled a list of presumptively disabling impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). In determining whether an impairment meets a Listing, the ALJ must determine whether the claimant satisfies each of the Listing's "criteria." For example, the Listings of mental impairments consist of three sets of "criteria" – the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to work. See,

3

(4) If not, does the claimant retain the residual functional capacity ("RFC") to perform her past relevant work?[3]

(5) If not, can she perform other jobs existing in significant numbers?

See, e.g., Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009).

The claimant bears the burden of presenting evidence at steps one through four, but if she reaches step five the burden shifts to the Commissioner to show that the claimant can make the adjustment to other work. See, e.g., Briscoe, 425 F.3d at 352. The Commissioner may carry this burden by either relying on the Medical-Vocational Guidelines, commonly known as "the Grid," a chart that classifies a person as disabled or not disabled based on her age, education, work experience and exertional ability, or by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite her limitations. See, e.g., Herron

---

e.g., Windus v. Barnhart, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004). The B criteria consist of four broad areas in which the SSA rates the claimant's degree of functional limitation: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The SSA rates the degree of limitation in the first three functional areas using a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). Certain Listings may also be met if the claimant has "marked" limitations in two areas.

[3]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of her impairments. SSR 96-8p. Physical RFC includes both "exertional" and "non-exertional" capacities. Exertional capacity refers to the claimant's strength-related abilities in the areas of sitting, standing, walking, lifting, carrying, pushing and pulling. Non-exertional capacity includes all work-related functions that do not depend on physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), and communicative (hearing, speaking) activities. SSR 96-8p. Mental RFC requires consideration of an expanded list of work-related capacities, including the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting. See, e.g., Wates v. Barnhart, 274 F. Supp. 2d 1024, 1036-37 (E.D. Wis. 2003).

4

v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994). However, because the Grid considers only exertional limitations, if the claimant has significant non-exertional limitations the ALJ may use the Grid only as a "framework" for decision and must also consult a VE. See, e.g., Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

## II. FACTS AND BACKGROUND

### A. Medical Evidence

The record contains a great deal of medical evidence, covering more than fifteen years. I discuss the medical evidence by provider/condition.

### 1. Dr. Austin Boyle (Back)

Plaintiff hurt her back while working at the post office in 1985, and the medical evidence of record begins with a February 21, 1992 visit to Dr. Austin Boyle at Milwaukee Orthopedic Specialists regarding an apparent exacerbation of that injury. Dr. Boyle assessed chronic lumbosacral strain/facet arthropathy and allowed plaintiff to return to work on February 24 with a corset and in accordance with permanent restrictions imposed on December 16, 1991. (Tr. at 284.) Those restrictions included a thirty pound weight limitation; sitting with back support up to eight hours per day; continuous standing of no more than four hours; kneeling no more than one hour per day, and bending and stooping no more than two to three hours per day; but no restrictions on walking or stair climbing, or on grasping, manipulation or reaching above the shoulder. (Tr. at 276.)

Plaintiff next saw Dr. Boyle on May 27, 1994, complaining of continued back pain, and currently working with a ten pound restriction and no bending. X-rays showed no definite abnormalities, perhaps slight narrowing at L5-S1. The doctor again diagnosed a chronic

5

lumbosacral strain, ordered an MRI and provided a prescription for a new corset. (Tr. at 283.) When plaintiff returned on June 17, Dr. Boyle noted that the MRI was completely normal, and on exam plaintiff had full range of motion but some tenderness to the lumbosacral junction. Dr. Boyle continued plaintiff on her permanent restrictions, provided a home exercise program, and advised use of over-the-counter medications, ice and heat. (Tr. at 282.)

Plaintiff returned to Dr. Boyle on July 20, 1994, having been off work since July 11 due to low back pain. Another physician had prescribed anti-inflammatory medication, and Dr. Boyle continue those medications and started her on physical therapy. (Tr. at 282.) On August 1, plaintiff reported that she was not better but wanted to return to work. Dr. Boyle allowed return to work subject to her permanent restrictions on August 2. (Tr. at 281.) By September 9, plaintiff reported improvement with therapy, and Dr. Boyle concluded that she was not a candidate for surgery or injection. (Tr. at 281.)

Plaintiff next saw Dr. Boyle on April 2, 1996, complaining of increased symptoms after her corset broke two months previously. Dr. Boyle made the same diagnosis, provided a prescription for a new corset, and authorized no time off. (Tr. at 280.) Plaintiff was a no-show for her appointment in August 12. (Tr. at 280.) On August 23, she reported continued back pain and was at the time four months pregnant. Dr. Boyle prescribed a new corset to accommodate the pregnancy. (Tr. at 280.)

Plaintiff did not see Dr. Boyle again until September 2, 2003, at which point she complained of worsening symptoms over the past two to three weeks, including pain and numbness in both legs. On exam, she had 50% reduced range of motion, and x-rays of the lumbar spine demonstrated minimal narrowing at L5-S1. Dr. Boyle prescribed Darvocet and a corset, and ordered an MRI. Plaintiff continued to work with her restrictions. (Tr. at 279.)

6

The MRI, completed the following day, was unremarkable, unchanged from the previous scan of June 1, 1994. (Tr. at 278.) When plaintiff returned to Dr. Boyle on September 9, she reported feeling somewhat better. He continued her on Darvocet, with use of the corset as needed. (Tr. at 277.) On September 25, 2003, Dr. Boyle prepared a letter setting forth plaintiff's permanent restrictions: lift-push-pull weight restriction of thirty pounds; seated with back support up to eight hours per day; standing at one time not to exceed four hours; no restriction on walking or stair climbing; kneeling not to exceed one hour per day; bending and stooping not to exceed two to three hours per day; simple grasping, fine manipulation and reaching above the shoulder not restricted; heat, cold, humidity exposure not restricted. (Tr. at 276.)

Plaintiff returned to Dr. Boyle regarding her back on July 12, 2004, complaining of an exacerbation after lifting groceries. She had been using a TENS unit, which provided some relief. Dr. Boyle again diagnosed a chronic lumbosacral strain, with recent exacerbation. Plaintiff was to continue with the TENS unit and prescription Flexeril. Plaintiff retired from the post office in January 2004. According to Dr. Boyle, she had no permanent disability rating/percentage at that time. (Tr. at 275.)

### 2. Drs. Borca and Pulito (Upper Extremities)

Plaintiff saw Dr. Heidi Borca at North Shore Orthopaedics on October 24, 2001, complaining of severe right hand pain, with numbness and tingling throughout the hand. Dr. Borca allowed plaintiff to return to work with left handed activities only and ordered an EMG. (Tr. at 518.) The EMG, completed on November 1, revealed very mild right median neuropathy at the right wrist, but no evidence of right focal ulnar neuropathy or right cervical radiculopathy. (Tr. at 264-65.) Plaintiff returned to Dr. Borca on November 8, with some improvement of her

7

symptoms with rest. Dr. Borca assessed De Quervain tenosynovitis on the right related to overuse and mild right median neuropathy. Dr. Borca continued plaintiff's work restrictions and referred her for occupational therapy and issuance of a thumb splint. (Tr. at 517.) On December 13, plaintiff reported significant improvement with limited work, the thumb splint and therapy. (Tr. at 517.) Dr. Borca provided an injection of Kenalog and Lidocaine, and continued work restrictions and therapy. (Tr. at 516.) However, on January 10, 2002, plaintiff reported that she was doing no better, with minimal benefit from the injection, and Dr. Borca suggested a surgical evaluation with her colleague Dr. Pulito. (Tr. at 515.)

Plaintiff saw Dr. Pulito on January 25, 2002, and he recommended surgery. (Tr. at 514.) Following a re-check on January 30, plaintiff agreed to proceed with the operation – a release of the first dorsal compartment of the right wrist (Tr. at 263; 514), which Dr. Pulito performed on February 15 (Tr. at 260-62; 514). On re-checks on February 18 and 22, plaintiff was noted to be doing well, with physical therapy to start the following week. (Tr. at 513.)

On March 15, 2002, plaintiff noted some pain and numbness on the right side, and Dr. Pulito suspected mild carpal tunnel syndrome, an additional problem. He continued her off work but indicated that she could do one-handed work if such was available. He also continued her physical therapy. (Tr. at 512.) On April 12, Dr. Pulito released plaintiff to limited duty, left hand only, with no use of her right hand for one month, and again continued her therapy. (Tr. at 511.) Plaintiff returned on May 10, having completed therapy, making some good progress. Dr. Pulito continued her on limited duty, lifting no more than ten pounds, but with a recommendation for a functional capacity evaluation and/or on site job analysis to see what she could do long term. On May 24, Dr. Pulito approved use of a TENS unit. (Tr. at 511.) On July 1, plaintiff reported doing better, but on August 1 she was still symptomatic. (Tr. at

8

510.)  Dr. Pulito indicated that she had reached a healing plateau and had 10% permanent partial disability ("ppd") at the right wrist.  (Tr. at 509.)

Plaintiff next saw Dr. Borca on September 5, 2002, complaining of sore elbows.  She was at the time working with a seven pound lifting restriction, which Dr. Borca continued.  The doctor also switched plaintiff from Vicodin to a non-steroidal, anti-inflammatory medication.  (Tr. at 508.)  On October 3, plaintiff returned to Dr. Borca having attending occupational therapy and using wrist splints.  Dr. Borca continued her restrictions and provided a prescription for Mobic.  (Tr. at 507.)  Plaintiff completed occupational therapy by November 7, advising Dr. Borca that her activities of daily living were getting easier.  Dr. Borca assessed bilateral upper extremity overuse syndrome, with right lateral epicondylitis and maintained her work restrictions.  (Tr. at 506-07.)  When plaintiff returned on December 19, she reported doing well with no regular medication use.  Dr. Borca continued her restrictions, provided a prescription for cyclobenzaprine and continued her home exercise programs and use of splints.  (Tr. at 506.)

On July 17, 2003, plaintiff told Dr. Borca that she had gotten progressively worse over the past month, with pain from the elbows to the wrists bilaterally.  Dr. Borca continued her restrictions, advised her to start using splints again, started her on Mobic, provided a prescription for Darvocet, and re-started physical therapy.  (Tr. at 505.)  On August 21, plaintiff continued to complain of significant difficulty with her upper extremities, despite therapy and use of splints.  Dr. Borca suggested a repeat EMG and re-evaluation by Dr. Pulito.  (Tr. at 504.)  On September 4, plaintiff reported being miserable, with significant difficulty with both hands.  Diagnostic testing revealed moderate carpal tunnel on the right side, progressive since her previous study.  Dr. Borca provided an injection to the left lateral epicondyle.  (Tr. at 504.)

9

Plaintiff reported significant difficulty at work, and they discussed limiting her to left hand work, but Dr. Borca did not think this an option given her flare of left lateral epicondylitis. Dr. Borca thus considered her temporarily totally disabled at the time. Dr. Borca ordered various tests and a follow-up with Dr. Pulito regarding possible surgery. (Tr. at 503.)

Plaintiff saw Dr. Pulito on September 19, 2003, and he noted that while x-rays of the right wrist were normal, an August 26, 2003, EMG revealed moderate right median neuropathy. Dr. Pultio recommended right carpal tunnel release. On September 25, plaintiff decided to proceed with the surgery. (Tr. at 502.) However, on November 13, plaintiff advised Dr. Borca that she had changed her mind. Dr. Borca advised her to continue splinting and with her home exercise program, and indicated that she could return to work as of November 17, 2003 with her previous permanent restrictions. (Tr. at 501.) Plaintiff again changed her mind and elected to undergo the carpal tunnel release, causing Dr. Borca to extend her work excuse through the surgery, which Dr. Pulito performed on December 4, 2003. (Tr. at 500-01.) She appeared to recover well, and on December 16, Dr. Pulito approved starting her on physical therapy but continued her off work. (Tr. at 500.) On January 16, 2004, Dr. Pulito noted plaintiff to be improving but continued her off work and in physical therapy. (Tr. at 499.) Dr. Pulito again continued her in therapy on February 17. (Tr. at 498.)[4]

Plaintiff returned on March 16, 2004, doing better but still having substantial problems, including weakness and dropping things. Dr. Pulito assumed that plaintiff was off work due to other problems; she requested a work excuse for two months, but Dr. Pulito advised that he could not do that. Dr. Pulito recommended a restriction on use of the right wrist, i.e. lifting no

_____

[4]Dr. Pulito stated that plaintiff had been approved for SSI disability, but it appears he was mistaken. (Tr. at 498.)

10

more than five pounds and no repetitious use of the right wrist for two months pending a final assessment at that time. (Tr. at 497.) On May 18, plaintiff was still symptomatic with her right wrist. She demonstrated reduced grip strength on the right, after a full physical therapy program. Dr. Pulito recommended a home exercise program and saw no need to consider her ability to return to work as she had retired. He opined that she had reached a healing plateau and assessed 5% ppd at the right wrist, with a restriction of lifting no more than five pounds and no repetitious use of the right wrist. (Tr. at 497.) On July 21, plaintiff saw Dr. Borca, who assessed 5% ppd related to her left elbow epicondylitis, 5% related to right elbow epicondylitis, 5% related to the De Quervain's release, and 5% for the right carpal tunnel release. Dr. Borca assessed permanent work restrictions of five pounds on the right and seven pounds on the left. (Tr. at 496.)

Plaintiff returned to Dr. Borca on October 19, 2005, complaining of left wrist and palm pain, and continued elbow soreness. Dr. Borca started her on medication, provide a left wrist splint and ordered an EMG to check for left carpal tunnel. (Tr. at 495.)

Plaintiff next saw Dr. Borca on October 2, 2006, with numbness in both hands. Dr. Borca ordered EMGs (Tr. at 554), and the tests, performed on October 25, demonstrated mild to moderate right median neuropathy at the wrist, mild to moderate left median neuropathy at the wrist, with no evidence of right or left cervical radiculopathy. (Tr. at 557-59.) On November 8, Dr. Borca assessed left median neuropathy at the wrist and a moderate flare of low back pain. Dr. Borca referred her to Dr. Pulito for possible carpal tunnel release on the left, and provided a referral for physical therapy for the lower back. (Tr. at 554.)

When plaintiff saw Dr. Pulito on November 13, 2006, she complained of a variety of problems following a recent motor vehicle accident, including a whiplash injury to the cervical

11

spine, left clavicle pain, mid-back pain, low back pain, and discomfort in both wrists. X-rays of the cervical spine showed loss of cervical lordosis, anterior spurring at multiple levels, and the beginning of minimal disc space deterioration and/or spondylosis. (Tr. at 553.) X-rays of the clavicle were essentially normal. X-rays of the thoracic spine showed mild scoliosis, mild spondylosis, and no overt bony pathology. Dr. Pulito assessed plaintiff's low back complaints as more of a minor exacerbation than a substantial problem, and saw no need for further diagnostic study. (Tr. at 552.) X-rays of the left wrist showed mild arthritic change with no acute bony pathology, and thus no further pathology secondary to the accident. However, based on the October 25, 2006, EMG, Dr. Pulito recommended left carpal tunnel decompression. (Tr. at 551-52.)

On December 8, 2006, plaintiff continued to complain of pain in the cervical and thoracic regions. On examination, her neck range of motion was limited. Dr. Pulito recommended physical therapy and hoped the issues would resolve. He scheduled a re-check in one month, at which time he would, if problems persisted, order an MRI. (Tr. at 551.) Plaintiff failed to appear for her appointment with Dr. Pulito on January 5, 2007. She returned on January 19, improved in all areas, except for continued pain in her neck. Dr. Pulito recommended an MRI (Tr. at 550), but the record does not appear to contain the results of that test, if performed.

### 3. Dr. Gozon (Back and Neck)

Plaintiff obtained treatment related to her October 30, 2006 motor vehicle accident from Dr. Benjamin Gozon at Capitol Rehabilitation Clinic. During her initial visit on November 6, 2006, she complained of headache and neck pain. (Tr. at 664.) On exam, she exhibited moderate to severe decreased range of motion of the cervical spine with moderate pain, stiffness and guarding. Dr. Gozon diagnosed cervical sprain/strain, tension headaches and

12

thoracic sprain/strain, and started her on physical therapy with over the counter analgesics as needed for pain. (Tr. at 665.) She returned for reevaluation on November 16, with mildly improved neck symptoms but with radiating pain down the mid back region between her shoulder blades. On exam, her range of motion was still mildly decreased over the cervical spine with moderate pain and stiffness. She also had tenderness to palpation along the thoraco-dorsal paraspinal region bilaterally. Dr. Gozon continued her therapy. (Tr. at 663.) Plaintiff noted further improvement on November 28, with some occasional tightness along the neck and mid back regions. Range of motion was quite functional over the cervical spine with some mild tightness at the end range. Dr. Gozon discontinued physical therapy and advised plaintiff to continue on a home exercise program. (Tr. at 662.) On December 12, plaintiff reported recurrent symptoms over the neck and mid back over the past week. On exam, she had tender spasms along the bilateral cervical and trapezius areas. Range of motion was functional over the cervical and lumbar spine. Dr. Gozon re-started physical therapy and considered cortisone injections if the symptoms continued. (Tr. at 661.)

On December 26, 2006, plaintiff reported that her symptoms were further improved with therapy. Dr. Gozon discontinued therapy and advised her to continue her home exercise program. (Tr. at 660.) Dr. Gozon discharged plaintiff from his care on January 9, 2007, after she reported complete resolution of symptoms, with no need for pain medications and resumption of activities of normal daily living without any problems. On exam, she displayed full and functional range of motion over the neck and upper extremities, mid and low back, and lower extremities with no pain, tenderness or discomfort in any of these areas. (Tr. at 659.)

13

### 4. VA Records

#### a. Treatment Records (Mental Health and Other Issues)

On September 18, 2003, plaintiff sought treatment for depression at the Veterans' Administration Medical Center, stating that she had a miscarriage at this time of year many years earlier and struggled with depression more at this time every year. She reported receiving treatment for depression in the past but not recently. She also reported drinking six or seven beers nightly until she fell asleep. (Tr. at 333.) Plaintiff thereafter obtained counseling and medication. (Tr. at 330.)

On September 23, 2003, plaintiff was seen at the VA complaining of shortness of breath and occasional chest pain. Her lab tests were normal, and the doctor suspected a GI source of her shortness of breath. Her blood pressure was elevated, and the doctor determined that she likely needed medication. She was to see her primary care physician ("PCP") for a re-check. (Tr. at 326-29.) Plaintiff did not show for her new PCP appointment on October 31. (Tr. at 325.)

On December 9, 2003, plaintiff saw psychiatrist Pamela Pletcher at the VA, indicating that she had "been depressed a long time." (Tr. at 322.) Her symptoms included lack of energy, fatigue, decreased motivation, tearfulness, insomnia and decreased appetite. She reported therapy once or twice per week at the VA since September 2003, which she found helpful. (Tr. at 322.) She had also been taking Paxil since September 2003, with no side effects and decreased crying. She also reported that she had stopped drinking. (Tr. at 323.) Dr. Pletcher diagnosed depressive disorder, not otherwise specified, with a GAF of 62.[5] Due

---

[5]GAF stands for Global Assessment of Functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person

14

to a concern about withdrawal symptoms when plaintiff discontinued Paxil in the past, Dr. Pletcher switched plaintiff to a longer acting SSRI, Fluoxetine. (Tr. at 324.)

On December 24, 2003, plaintiff saw her new VA PCP, Dr. Jennifer Zebrack. She reported doing fairly well after her recent carpal tunnel surgery but reported some periodic numbness in the arms. (Tr. at 316.) Dr. Zebrack ordered a c-spine x-ray related to plaintiff's complaints of arm numbness, which revealed early degenerative spurring along the anterior aspect of the mid cervical spine but no evidence of intervertebral disc narrowing. (Tr. at 320.)

Plaintiff spoke to Dr. Pletcher by phone on January 12, 2004, complaining that her anxiety level persisted, despite the use of medication. Dr. Pletcher increased plaintiff's medication dose. (Tr. at 315.) Plaintiff saw Dr. Pletcher in person on February 24, reporting some decrease in overall anxiety with the increased medication dose. She also noted a decrease in depressed mood and tearfulness, and reported avoiding alcohol despite socializing with drinking friends. Long-term agoraphobia limited her grocery shopping, which her husband did. She reported attending her daughter's track meets but stayed in the car. She also reported paranoid, anxious feelings in the waiting room prior to the appointment. She continued individual therapy at the VA but did not feel able to attend group sessions. Dr. Pletcher continued her medications and scheduled a return for three months. (Tr. at 312-13.)

Plaintiff spoke to Dr. Pletcher by phone on April 20, 2004, reporting increased anxiety after being told she may have to return to work at the post office. She also related a recent three day fishing trip, the first time she had been able to relax in years. Dr. Pletcher added the

_____

who presents a persistent danger of hurting herself or others. Scores of 61-70 reflect "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms and 31-40 a "major impairment." Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

medication buspirone and encouraged her to see psychologist Michelle Cornette at the VA, as plaintiff had cancelled a previous appointment. (Tr. at 312.)

On April 27, 2004, plaintiff saw Dr. Cornette, complaining primarily of situation-specific anxiety, and Dr. Cornette scheduled a further assessment to distinguish between social phobia, agoraphobia and/or panic disorder. (Tr. at 311.) Plaintiff returned to Dr. Cornette on May 3, continuing to exhibit symptoms of social anxiety but very open to treatment. She had taken recent, positive steps, including going to a store and remaining there alone. Dr. Cornette provided relaxation exercises. (Tr. at 310.) Plaintiff again saw Dr. Cornette on May 19, with continued anxiety in social situations. (Tr. at 309.) Plaintiff was a no-show for her appointments with Dr. Cornette and Dr. Pletcher on May 25. (Tr. at 308.) She returned to treatment with Dr. Cornette on July 20, with continued symptoms of social phobia. (Tr. at 307-08.) She saw Dr. Pletcher the following day for medication management, reporting a recent panic attack in a grocery store and anxiety that she might have to return to work. (Tr. at 306-07.) She saw Dr. Cornette on July 26, with continued symptoms of social phobia and anxiety about the prospect of returning to work. Dr. Cornette assured her that she could leave if she found work intolerable, but challenged her belief that she absolutely could not return, noting that she had worked there for twenty years and could work toward strategies to feel more comfortable there. (Tr. at 305-06.)

Plaintiff saw Dr. Zebrack on August 2, 2004, reporting doing fairly well overall. She still had some chronic low back pain and right arm pain. She reported that her private orthopedic doctor provided light duty restrictions a few years ago, but she did not feel she could lift 30 pounds or perform some of the other duties outlined in his letter and was interested in a second opinion. (Tr. at 303.) Dr. Zebrack planned a functional capacity exam. (Tr. at 305.)

16

On August 2, 2004, plaintiff returned to Dr. Cornette with symptoms of social phobia. (Tr. at 301.) Dr. Cornette again challenged plaintiff's belief that she absolutely could not return to work, and advised her to continue relaxation training. (Tr. at 302.) On August 17, plaintiff reported continued social phobia but was highly motivated to work on it. (Tr. at 299.)

On September 1, 2004, plaintiff underwent a functional capacity evaluation at the VA, complaining of back pain, for which she wore a brace; pain in her right hand, which limited her performance of daily activities; and fatigue, which required her to stop and rest after carrying laundry up the stairs. Plaintiff reported that she had retired from the post office in January 2004 due to problems with her right arm and back. (Tr. at 294.) On testing, her right hand grip strength was about 30% below normal, her pinch strength about 20% below normal. However, her left hand strength was slightly above normal. (Tr. at 294-95.) Plaintiff was able to lift 16.5 pounds from floor to waist, waist to shoulder and shoulder to overhead; and to carry 21.5 pounds for twenty feet. (Tr. at 296.) Based on the testing, the evaluation found plaintiff capable of light-medium work (i.e., exerting 35 pounds of force occasionally or 18 pounds frequently, or seven pounds of force constantly during an eight hour workday). (Tr. at 297.) Her mobility and balance were normal. (Tr. at 297.)

On September 2, 2004, plaintiff saw Dr. Cornette, who noted that plaintiff continued to manifest symptoms of social phobia but appeared highly motivated to work on the issue. Dr. Cornette provided relaxation exercises. Plaintiff's mood was euthymic,[6] her affect somewhat restricted, and her thought process slightly tangential. (Tr. at 298.) Plaintiff was a no-show for her September 21 appointment. (Tr. at 392.)

---

[6]Euthymia refers to moderation of mood, not manic or depressed. Stedman's Medical Dictionary 627 (27th ed. 2000).

On October 6, 2004, plaintiff spoke to Dr. Cornette by phone, reporting anxiety regarding her upcoming swimming lessons. (Tr. at 390.) Plaintiff returned to Dr. Pletcher on October 19, indicating that her new, smaller pills were easier to swallow, but complained of nausea. She also indicated that therapy had been very helpful, and that she hoped to increase her activities but was still quite limited. (Tr. at 388-89.) Her husband did the grocery shopping. She attended an open house at her children's school but spoke to no one, wore sunglasses and left promptly. Dr. Pletcher noted plaintiff to have a bright affect with mild anxiety. Dr. Pletcher devised a plan for plaintiff to take her medications by emptying the contents of the capsule into applesauce or yogurt. (Tr. at 389.)

Plaintiff returned to the VA on October 20, 2004, complaining of left buttock pain, for which she was given ibuprofen. (Tr. at 385-87.) She saw Dr. Cornette on October 25, continuing to manifest symptoms of social phobia (Tr. at 385), but was a no show on November 1 (Tr. at 384).

On November 9, 2004, plaintiff reported a lapse in her sobriety and some continued social phobia. However, she had worked on relaxation, with substantial relief. Her mood was noted to be euthymic, but mildly anxious; her affect, full range; with very mildly tangential thought processes. (Tr. at 382-83.) Plaintiff spoke to Dr. Pletcher by phone on November 30, indicating that she could not tolerate any prozac due to nausea. She continued to take buspar and reported doing okay overall. Dr. Pletcher noted that plaintiff initially started on paxil, with good results, but with side effects when she missed a dose. She was therefore switched to prozac, which she initially tolerated. An attempt to switch her to citlopram was not successful due to pill size. Dr. Pletcher resumed plaintiff on paxil and continued buspar. (Tr. at 382.)

Plaintiff returned to Dr. Cornette on January 3, 2005, and was noted to have dysphoric

18

mood,[7] somewhat restricted affect, and tangential thought processes requiring frequent redirection. She was advised to continue to practice relaxation techniques. (Tr. at 380-81.) She was a no-show for her appointment with Dr. Pletcher on January 25. (Tr. at 380.)

Plaintiff saw Dr. Cornette on January 26, 2005, again with dysphoric mood, somewhat restricted affect, and anxiously tangential thought processes. She reported not attempting to go to church alone and continued trouble asserting herself, and continued to experience symptoms of social phobia and dysphoria. (Tr. at 379.)

Plaintiff next saw Dr. Cornette on June 14, 2005, continuing to manifest symptoms of social phobia and depression. (Tr. at 452-53.) She was a no-show for her appointments with Dr. Cornette on June 27 and July 12. (Tr. at 451-52.) She returned to Dr. Pletcher on July 19, accompanied by her daughter, raising some issues with her medications. Overall, she reported doing better, feeling calmer and less reactive to situations. She reported flying to LA for a funeral and taking her children to Wisconsin Dells, without problems. Dr. Pletcher noted plaintiff to be attentive and alert, with minimal anxiety, and normal thought processes. (Tr. at 450-51.)

On July 24, 2005, plaintiff called the VA regarding a flare-up of back pain with difficulty getting out of bed. (Tr. at 449.) A nurse advised her to take it easy for a few days, use a firm mattress, avoid prolonged sitting, lifting or jumping, take pain medication and use moist heat. (Tr. at 450.)

Plaintiff returned to Dr. Cornette on July 26, 2005, with continued manifestation of social phobia/dysphoria. Dr. Cornette opined that personality/motivational issues complicated the

_____

[7]Dysphoria refers to a mood of general dissatisfaction, restlessness, depression and anxiety. Stedman's Medical Dictionary 554 (27th ed. 2000).

19

picture. (Tr. at 448.) Plaintiff spoke to Dr. Pletcher on August 2, raising further issues with medication side effects. Dr. Pletcher started plaintiff on sertraline. (Tr. at 447-48.) Plaintiff failed to appear for her appointment with Dr. Cornette on August 16. (Tr. at 447.)

Plaintiff returned to Dr. Cornette on September 19, 2005, with continued symptoms of social phobia, but lessened dysphoria. She reported taking a fishing trip by herself. (Tr. at 445.) Plaintiff saw Dr. Zebrack on September 20, continuing to complain of stiffness in the hands, fingers and wrists. X-rays and an EMG from March had been normal. She also complained of pain in the knees. (Tr. at 442.) Dr. Zebrack ordered x-rays and requested a rheumatology consult. (Tr. at 443-44.) X-rays of plaintiff's hands taken on September 20 were negative. (Tr. at 422-23.) Plaintiff returned to the VA for her rheumatology consult on October 11, and detailed her past wrist and hand treatment, indicating that the numbness improved somewhat on the right after her 2003 carpal tunnel surgery. She further indicated that wearing braces helped, and that she wore them most of the time. (Tr. at 426-27.) She complained of worsening pain with grasping, turning the wrist and using her hands for household work. (Tr. at 427-28.) The pain had been better the past year after she stopped working, but she had modified her home activities. She also stated that chronic back pain limited her walking. (Tr. at 428.) On exam, plaintiff complained of pain with extension of the right wrist but had no swelling and full range of motion. She also had full range of motion of the elbows but was tender over the epicondyles, left greater than right. She also demonstrated full range of motion of the knees, ankles, back and neck. However, she exhibited subdermal swelling over the C-7 area. (Tr. at 429.) An EMG performed in March 2005 demonstrated no evidence of left ulnar neuropathy or left carpal tunnel. The impression of nurse practitioner ("NP") Wendy Janssen and staff rheumatologist Ann Rosenthal was chronic hand pain, with no evidence of

20

inflammatory or significant degenerative arthritis. (Tr. at 430.) They ordered x-rays, which revealed mild cervical degenerative joint disease (Tr. at 421-22), possible minimal left sacroiliac arthritis (Tr. at 420-21), and mild lumbar degenerative joint disease (Tr. at 420). Plaintiff was fitted for bilateral tennis elbow bands. (Tr. at 424.)

Plaintiff saw Dr. Pletcher on October 12, 2005, tolerating sertraline with no side effects. She was still troubled by anxiety, with occasional tearfulness, but otherwise feeling well. Dr. Pletcher found her upbeat, with minimal anxiety, and normal thought processes. (Tr. at 436.) Plaintiff was a no show for her appointments on November 29, December 5, and December 6, 2005. (Tr. at 486-87.) On December 9, plaintiff appeared at the VA walk-in clinic, complaining of extreme anxiety and headache. She was provided medication for her headache and agreed to an increase in her sertraline dosage. (Tr. at 481-86.)

On December 12, 2005, plaintiff returned to NP Janssen for follow-up of her hand pain. Since last seen, she noted persistent left hand locking up and worsening hand pain after doing something. (Tr. at 478.) She also complained of continued back pain, for which she used a TENS unit. She wore a splint on the right and tennis band on her left arm. She further complained of some numbness in the right fingers and numbness in the left forearm. (Tr. at 479.) On exam, she had full range of motion of the wrists (Tr. at 479), was mildly tender over the left elbow, with no spinal tenderness (Tr. at 480). NP Janssen's impression was chronic low back pain, hand pain without evidence of arthritis, inflammation or radiographic abnormalities. The plan was to continue analgesic ointment and NSAID with food. (Tr. at 480.)

Plaintiff also saw Dr. Cornette on December 12, 2005, presenting as distressed over issues with her retirement benefits and her husband's health problems. (Tr. at 477.) Dr. Cornette assessed symptoms of anxiety/depression, prominent that day. (Tr. at 478.) On

21

December 20, despite resolution of the retirement issue, with payments expected in January, plaintiff presented to Dr. Cornette as frustrated and confused regarding her social security disability application. Dr. Cornette stated that she did "not feel comfortable indicating [plaintiff] 'cannot work' secondary to mental health issues, though accommodation may be indicated." (Tr. at 475.) Plaintiff was a no-show for her January 9, 2006, appointment with Dr. Cornette. (Tr. at 474.)

Plaintiff saw Dr. Cornette on January 31, 2006, reporting feeling very overwhelmed related to financial problems and issues with her children. (Tr. at 652.) Her mood was dysphoric/anxious, her affect congruent, tearful at times, and her speech pressured. (Tr. at 653.) On February 14, she continued to report frustration. She expressed reticence in participating in welfare to work training, which required her to be around a lot of other people. Dr. Cornette encouraged her to seek accommodations such as individual sessions or allowing her husband to accompany her. Dr. Cornette noted that plaintiff's reticence to work appeared related to her concerns about being around people, and they discussed jobs that might enable plaintiff to work relatively independently. (Tr. at 651-52.) Plaintiff was a no-show for her appointment with Dr. Pletcher on February 21. (Tr. at 651.)

Plaintiff saw Dr. Zebrack on February 28, 2006, for a routine follow-up. She complained of left upper quad pain and some pain anterior to the left ear. Plaintiff had also lost about twenty-two pounds over the past year, for unknown reasons. Dr. Zebrack ordered tests and provided medication for a possible dental infection. (Tr. at 648-49.) Plaintiff also saw Dr. Pletcher on February 28, indicating that she forgot to increase her sertraline dosage as previously recommended. She was feeling stressed/anxious, trying to work on disability. (Tr. at 643.) She was attentive and alert, with neutral mood, full affect, and normal thought

22

processes. (Tr. at 644.) In March and April 2006, plaintiff attended assertiveness training, as recommended by Dr. Cornette, as well as a smoking cessation program. (Tr. at 636-42.)

Plaintiff returned to Dr. Cornette on April 5, 2006, continuing to deal with issues of anxiety surrounding retirement and social phobia (Tr. at 635), issues they again addressed on May 3 (Tr. at 633-34). Plaintiff spoke to Dr. Pletcher by phone on June 13, having cancelled her April appointment, last seen in February, requesting a medication refill. Dr. Pletcher suspected that plaintiff had not been taking sertraline as recommended and stressed the importance of doing so. (Tr. at 631-32.) Plaintiff saw Dr. Pletcher in person on June 20, noting that she was taking sertraline regularly without side effects. She also indicated that she was trying to use her coping skills and succeeded in attending church recently. She was noted to be attentive, alert, mildly anxious, with normal thought processes and good insight and judgment. (Tr. at 630-31.) She saw Dr. Cornette on July 18, indicating that she had attained the goal of attending church on her own. (Tr. at 631.) She further reported bringing her children to a school function and expressed a desire to continue working on assertiveness, to include situations related to parenting. Finally, she expressed contentment with her financial situation, having received retirement benefits, and did not intend to pursue welfare-to-work, even with restrictions, as she "would prefer not to work at this time." (Tr. at 630.) Dr. Cornette advised plaintiff to continue to build on her successes, as anxiety would lessen with additional exposures. (Tr. at 630.) Plaintiff was a no-show for her appointments with Dr. Cornette on July 24 and Dr. Pletcher on July 25. (Tr. at 628-29.) When she returned to Dr. Cornette on August 10, things were basically the same. (Tr. at 627-28.) On August 21, she discussed family issues (Tr. at 626-27), and on August 28 she reported attending church with her son (Tr. at 625).

23

Plaintiff saw Dr. Pletcher on September 12, 2006, observed to be attentive and alert, with mildly anxious mood/affect, normal thought processes and fairly good insight/judgment. She agreed to another attempt to increase her sertraline dosage. (Tr. at 624-25.) Plaintiff failed to appear for appointments with her new VA PCP on September 14, October 27 and November 6. (Tr. at 622-23.)

Plaintiff called the VA on November 7, 2006, following her involvement in the October 30, 2006, motor vehicle accident, complaining of neck pain/stiffness, headache, stomach ache, pain with urination, and shooting tingling in her legs. (Tr. at 621.) She was advised to lie still and call 911. (Tr. at 622.) Plaintiff saw a VA doctor on November 21, complaining of chest pressure and worsening headache pain after the accident. (Tr. at 614-15.) Plaintiff explained that she did not go to an emergency room after the accident but felt confused and dizzy during the days thereafter. On November 8, she saw her orthopedic surgeon, who took x-rays, which revealed no fractures. She had been attending physical therapy three times per week with no significant improvement. Since the accident, she also had worsening headache pain, untouched by medication, and progressively worsening lower chest wall pain with associated tightness and dyspnea. (Tr. at 615.) A head CT scan was normal, as were chest/cardiac scans. (Tr. at 618.) The doctor assessed closed head trauma/post-concussion syndrome, providing Toradol and prescribing Percocet and Flexeril; and hypertension, which lowered after receiving the Toradol. Plaintiff was instructed to follow up with her PCP regarding her blood pressure. (Tr. at 620.)

Plaintiff saw Dr. Cornette on November 21, 2006, reporting that she had been attending church regularly but struggling with some family issues. (Tr. at 612.) On December 5, Dr. Cornette again encouraged plaintiff to build upon her successes, with anxiety continuing to

24

lessen with further exposures. (Tr. at 611.) Plaintiff saw Dr. Pletcher on December 12, feeling a little better. She reported increased nausea for one week after increasing her sertraline dose, which then resolved. She complained of no further medication side effects. She had been attending physical therapy and feeling more hopeful. (Tr. at 609.) Dr. Pletcher continued her medications. On mental status exam, Dr. Pletcher found plaintiff neatly groomed and dressed, talking to another veteran in the waiting room, attentive, smiling, euthymic with full affect, minimal anxiety, and linear thought processes. (Tr. at 610.)

Plaintiff returned to Dr. Cornette on December 18, 2006, continuing the address assertiveness and work with exposure to address social phobia. (Tr. at 608-09.) On December 24, plaintiff presented with a painful cyst on her upper mid back. (Tr. at 603-04.) VA doctors provided Keflex and instructed her to see dermatology for possible excision. (Tr. at 607.) On December 29, plaintiff reported that the cyst had been draining on its own but requested medication for pain. (Tr. at 600-02.)

Plaintiff saw Dr. Cornette on January 10, 2007, continuing the address assertiveness and work with exposure to address social phobia. (Tr. at 98-99.) Plaintiff saw dermatology on January 19 and elected to proceed with observation rather than excision. (Tr. at 597-98.) Plaintiff was a no-show for her appointment with Dr. Cornette on February 26 (Tr. at 596-97), and cancelled her appointment with Dr. Pletcher on March 13 (Tr at 610). She returned to Dr. Cornette on March 19, addressing the same issues. (Tr. at 595-96.) On March 26, plaintiff advised Dr. Cornette that she had taken a sip of alcohol but did not pursue it. She also reported going out to dinner with her husband, brother-in-law and his wife, and attending functions at her children's school. She reported no need to take Lorazepam lately. Concerned about her progress in treatment, Dr. Cornette discussed the need for focused efforts to address

25

her goals. (Tr. at 594-95.) Plaintiff was a no-show for her appointment with Dr. Cornette on April 19 and with her VA medical doctor on April 27. (Tr. at 594.)

During her May 2007 visits with Dr. Cornette, plaintiff reported crying a bit, which she attributed to missing her medications for a few days. She also reported visiting her son's school and going to church with her son. (Tr. at 591.) On June 13, she reported continuing to cry frequently. Dr. Cornette noted some recent instances in which plaintiff had asserted herself, suggesting a lack of difficulty in this area at times. Plaintiff also reported taking her daughter to the DMV and her niece to the hospital to have a baby. On mental status exam, Dr. Cornette found plaintiff's mood euthymic, her affect congruent, her speech rapid and her thoughts racing a bit. (Tr. at 588-89.) On August 1, plaintiff discussed issues with her family and stated that she was still too meek. (Tr. at 585.) Plaintiff saw Dr. Pletcher on August 7, stating that she was "doing pretty well." (Tr. at 583.) Her mood was optimistic and she expressed interest in another assertiveness group. (Tr. at 583.) Dr. Pletcher noted her to be smiling, attentive, with full affect, linear thought processes, fairly good insight and judgment. She rated her pain as 0 on a 0-10 scale and stated that she was comfortable with her current pain medication plan. Plaintiff agreed to another increase in sertraline from 100 to 150 mg per day. (Tr. at 584.)

Plaintiff saw Dr. Mehraby, in place of Dr. Zebrack, on August 15, 2007, complaining of back pain. (Tr. at 576.) The doctor found "no red flags, neuro intact" and proscribed mobic. (Tr. at 579.) Plaintiff returned to Dr. Cornette on August 22, with mildly anxious mood and a full range affect. (Tr. at 573.) On September 19, plaintiff reported increased stress after her husband had another seizure. She attended her daughter's game the previous day but did not interact with others. Her mood was anxious but with full range affect. (Tr. at 570.) Plaintiff

26

skipped her sessions with Dr. Pletcher on October 9 and Dr. Cornette on October 27. (Tr. at 569.) Plaintiff returned to Dr. Pletcher on November 20, discussing family issues. She was neatly groomed and dressed, polite, smiling, euthymic, hopeful overall, with linear thought processes and fairly good insight/judgment. (Tr. at 567.)

On February 25, 2008, Dr. Pletcher completed a mental RFC questionnaire, listing a diagnosis of panic disorder with agoraphobia, a current GAF of 50 and a highest GAF of 50 in the past year. Dr. Pletcher indicated that plaintiff obtained cognitive behavioral treatment with Dr. Cornette and took SSRI's, which had been a challenge due to issues with side effects, including nausea, headaches and sedation. However, plaintiff had slowly progressed on sertraline. As clinical findings, Dr. Plecther indicated that plaintiff was neatly dressed and groomed, polite, cooperative with anxious mood and affect, linear thought process, some distractability, no suicidal/homicidal ideation, and fairly good insight and judgment. Her prognosis was guarded. (Tr. at 685.) As signs and symptoms, Dr. Pletcher listed anhedonia, appetite disturbance, decreased energy, feelings of worthlessness, impaired impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, apprehensive expectation, emotional withdrawal or isolation, persistent irrational fear, sleep disturbance, and recurrent severe panic attacks. (Tr. at 686.) Regarding plaintiff's abilities to do unskilled work, Dr. Pletcher indicated that plaintiff had no useful ability to function in the areas of maintaining regular attendance, completing a normal workday without interruptions from psychologically based symptoms, performing at a consistent pace and dealing with normal work stress, and was unable to meet competitive standards in the areas of remembering work-like procedures, maintaining attention for a two hour segment, sustaining an ordinary routine without special supervision and making simple work-related decisions. She was seriously

27

limited, but not precluded, in the areas of understanding and remembering short and simple instructions, carrying out short and simple instructions, working in coordination with others, asking simple questions or requesting assistance, and responding appropriately to changes in a routine work setting. (Tr. at 687.) Dr. Pletcher found that plaintiff had no useful ability or could not meet competitive standards for semi-skilled and skilled work. She wrote that plaintiff's persistent and severe anxiety, punctuated by panic attacks and the fear of panic attacks, caused severe to extreme limitations in work abilities, particularly concentration, flexibility and consistency. She further indicated that plaintiff lacked the ability to travel in unfamiliar places or use public transportation, that plaintiff was currently able to function in a severely limited arena, and that her spouse typically did the grocery shopping. (Tr. at 688.) She opined that plaintiff would be absent more than four times per months due to her condition. (Tr. at 689.)

### b. VA Disability Award

On November 18, 2006, the VA granted plaintiff's disability claim based on panic disorder with agoraphobia (initially claimed as post traumatic stress disorder), with an evaluation of 50% effective November 19, 2004. (Tr. at 676.) The decision indicated that plaintiff based her claim on PTSD caused by or linked to an in-service stressor. (Tr. at 677.) Plaintiff alleged that she lost a child while in service and was told she could not have any more children. As a result, she began drinking and using drugs. Plaintiff further claimed she was sexually assaulted by a sergeant and that other women "came on" to her. In addition to drinking in excess, she began experiencing panic attacks and suffered from acid reflux. She reported currently dealing with ongoing depression and self doubt as a result of these experiences. Service medical records showed treatment for an ectopic pregnancy in 1982 and

28

for a sexually transmitted disease in 1981 with ongoing treatment for chronic vaginal infections and abdominal pain. (Tr. at 678.) The records further showed treatment for complaints of trouble breathing and heart palpitations in 1981. Notes from September 1983 indicated that she was seen for supportive therapy for various personal problems, and in August 1983 she requested a VD check. The VA decision stated that these records, including treatment for recurring infections, ectopic pregnancy and probable panic attacks, served to support and give credence to her contended stressors. The VA therefore conceded her "stressor." (Tr. at 679.)

The decision then indicated that current VA records documented an assessment of panic disorder with a history of alcohol dependency and agoraphobia. The records also denoted social phobia and problems with assertiveness. The VA therefore had plaintiff examined, but the examiner concluded that she did meet the criteria for a diagnosis of PTSD. (Tr. at 679-80.) However, he did find that her current symptoms were consistent with a current diagnosis of panic disorder with agoraphobia, and that such diagnosis was "as likely as not" related to her in-service stressors. Therefore, the VA established service-connection for panic disorder with agoraphobia and assigned an evaluation of 50% effective November 19, 2004, the date of filing of the initial claim. (Tr. at 680.)[8]

## B.    SSA Consultants

On March 1, 2004, state agency consultant Dr. Michael Baumblatt completed a physical RFC assessment, finding plaintiff capable of light work with no repetitive use of the upper

---

[8]Although the VA examiner's report was not presented to the ALJ, plaintiff obtained and filed it with the Appeals Council (Tr. at 692), and it is thus in the administrative record (Tr. at 694-701). However, because the Appeals Council denied plaintiff's request to review the ALJ's decision, I may not consider this report as a basis for finding reversible error. Rice v. Barnhart, 384 F.3d 363, 366 n.2 (7th Cir. 2004).

29

extremities, but no other non-exertional limitations. (Tr. at 266-73.) On October 26, 2004, Frances Culbertson, Ph.D, prepared a psychiatric review technique form ("PRTF") for the SSA, evaluating plaintiff under Listing 12.04, Affective Disorders, 12.06, Anxiety-Related Disorders, and 12.09, Substance Addiction Disorders. (Tr. at 353.) Under the B criteria, Dr. Culbertson found moderate limitation of activities of daily living; moderate limitation in social functioning; mild limitation in concentration, persistence and pace; and no episodes of decompensation of extended duration. (Tr. at 363.) He found no evidence establishing the presence of the C criteria. (Tr. at 364.) In an accompanying mental RFC report, Dr. Culbertson found moderate limitations in ten areas, no significant limitation in ten areas. (Tr. at 367-68.)

On October 27, 2004, Dr. Baumblatt prepared another physical RFC assessment, finding plaintiff capable of light work with occasional handling on the right but no restriction on the left. (Tr. at 371-78.) Another consultant reviewed and affirmed the assessment on May 12, 2005. (Tr. at 378.)

On May 16, 2005, William Merrick, Ph.D, completed a PRTF, evaluating plaintiff under Listings 12.04 and 12.06, and finding insufficient evidence to rate the B criteria. (Tr. at 406-16.) On November 14, 2005, Keith Bauer, Ph.D., completed a PRTF, evaluating plaintiff under Listings 12.06 and 12.09. (Tr. at 458.) Under the B criteria, he found mild restriction of activities of daily living; mild difficulty in maintaining social functioning; no limitation in maintaining concentration, persistence and pace; and no episodes of decompensation. (Tr. at 468.)

On November 15, 2005, Dr. Mina Khorshidi prepared a physical RFC report, finding plaintiff capable of medium work with no other limitations. (Tr. at 520-27.) Dr. Zhen Lu affirmed the assessment on February 17, 2006. (Tr. at 519.)

30

On February 20, 2006, Dr. Merrick completed another PRTF, evaluating plaintiff under Listings 12.04 and 12.06, with mild limitations in activities of daily living, maintaining social functioning, and concentration, persistence and pace, with no episodes of decompensation under the B criteria. (Tr. at 528-38.) In an accompanying mental RFC report, he found her not significantly limited in thirteen areas, moderately limited in seven. (Tr. at 542-44.)

## C. Hearing Testimony

### 1. Plaintiff's Testimony

Plaintiff testified that she was fifty years old with a high school level education. (Tr. at 705-06.) She indicated that she last worked in 2003 for the post office. (Tr. at 707.) She lived with her ex-husband and three minor children. (Tr. at 706; 708.) She testified that she took various medications and experienced no side effects if she took them as directed and did not miss doses. (Tr. at 711.) She testified that she took pain medication only when she experienced severe pain, which occurred two or three times per year. (Tr. at 710; 724.)

Plaintiff testified that she experienced pain in her back, both arms, down her legs and in her neck. (Tr. a 711.) She used a TENS machine, icy hot, a heating pad and various braces for the pain. (Tr. at 712-13.) Plaintiff testified that on a typical day she got up, sent the kids to school, then returned to bed until about noon. (Tr. at 713-14.) She then got up and watched TV until her kids came home, when she would help them with their homework or take them to sports practice. She indicated that she was able to bathe, shower and dress herself, but her ex-husband did most of the cooking and grocery shopping, and she wore a wig because she could not fix her hair. She did dishes and some housecleaning, but her children did the laundry. (Tr. at 714-15; 726.) She stated that her hands locked up if she wrote too much and

sometimes locked up while she was driving.  (Tr. at 727.)

Plaintiff testified that she could not work because her hands and back locked up, she could not lift more than ten pounds, she could not do excessive bending, and she could not stand for more than fifteen to thirty minutes.  She also stated that she had an assertiveness problem and panic attacks.  (Tr. at 717.)  She explained that during a panic attack she broke out in a sweat and had to leave the building.  She stated that she had panic attacks two or three times per month, triggered by crowds or inappropriate behavior by others.  When she had an attack, she locked herself in the house and took lorazepam.  (Tr. at 718.)

## 2.  VE's Testimony

The VE, Jacquelyn Wenkman, classified plaintiff's past work for the postal service in several different categories: postal clerk, light, semi-skilled work; postal carrier, medium, semi-skilled work; mail handler, light, semi-skilled work; and timekeeper/supervisor, sedentary, semi-skilled.  (Tr. at 737-38.)  None of these jobs produced transferrable skills.  The ALJ then asked a series of hypothetical questions, assuming a person age fifty, with a high school education and work history like plaintiff's.  The first question assumed person capable of medium work (but with a lifting limit of thirty pounds), occasional postural movements, frequent use of the right arm with no rapid movement of the right arm.  The VE opined that such a person could perform plaintiff's past jobs except for the mail carrier position.  If the person was limited to light work, the answer would be the same.  (Tr. at 738.)  If the person was limited to sedentary work, only the timekeeper job could be done.  The timekeeper job would allow alternation of positions from seated to standing as needed, but not the other past jobs.  If the person could have no public contact and only occasional interaction with co-workers, the mail carrier job could not be done but the others could.  If the person was limited to unskilled, simple, routine work, none

32

of the past jobs could be done.  However, the VE identified other jobs that could be done at the light and sedentary level, including mail clerk, general office work and messenger.  (Tr. at 739-40.)  If the person could only occasionally use the right arm, the mail clerk job could not be done but the other two could.  If the person could only lift five pounds, none of the jobs could be done.  (Tr. at 740.)  If the person were limited as indicated in Dr. Pletcher's report, no jobs could be done.  (Tr. at 745.)

**D.    ALJ's Decision**

The ALJ determined that plaintiff had not worked since her alleged onset of disability, and that she suffered from severe impairments, including tendinitis, carpal tunnel syndrome, back pain, degenerative disc disease, degenerative joint disease, arthritis, scoliosis, spondylosis, epicondylitis, wrist neuropathy, hypertension, gastroesophageal reflux disease, headaches, depression, anxiety, PTSD, panic attacks and agoraphobia, none of which met or equaled a Listing.  (Tr. at 22-23.)  The ALJ then found that plaintiff retained the RFC for light,[9] unskilled, simple work involving no public contact and only occasional interaction with co-workers; only occasional stooping and crouching; and frequent use of the right upper extremity with no rapid movement.  (Tr. at 24.)

In making this finding, the ALJ considered the medical evidence and plaintiff's testimony about her symptoms.  (Tr. at 29-30.)  Regarding plaintiff's wrist problems, the ALJ noted that after surgical intervention the records showed only minor discomfort addressed with

_____

[9]Under SSA regulations, light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  Even though the weight lifted may be very little, a job is also in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. § 404.1567(b).

33

conservative treatment.  Regarding plaintiff's back pain, the ALJ noted that x-rays demonstrated minimal degenerative changes, also addressed with conservative measures. The ALJ also noted that Dr. Boyle found plaintiff capable of light work and a subsequent capacity evaluation at the VA concluded that she could perform light to medium work. Regarding plaintiff's complaints of hand pain, the ALJ noted that a March 2005 EMG was normal, hand x-rays were normal, and cervical x-rays revealed only mild degenerative changes. An October 2006 EMG showed mild to moderate bilateral median neuropathy at the wrists but no bilateral cervical neuropathy, and conservative treatment was again recommended.  Tests completed after the 2006 auto accident likewise revealed little evidence of abnormality, and plaintiff was again treated conservatively with medication and physical therapy.  At the time of discharge from therapy in January 2007, plaintiff reported complete resolution of her symptoms, and on exam she had full and functional range of motion of the neck, back and upper extremities.  (Tr. at 30.)

The ALJ noted plaintiff's hearing testimony that she continued to experience pain, but noted that she reported good relief with use of a TENS unit, analgesics and a brace.  While plaintiff had been prescribed medications, she did not take all of them on a regular basis, with pain medications used only a few times per year.  Plaintiff also reported the ability to do a number of routine household tasks on a regular basis without significant difficulty.  Therefore, the ALJ concluded that while the medical evidence showed that plaintiff had some limitations related to her physical problems, those limitations did not preclude the performance of light work as outlined in the RFC.  (Tr. at 30.)

Regarding plaintiff's mental health issues, the ALJ noted that the record reflected that plaintiff experienced some depression and anxiety related to the loss of a child, and that she

34

reported ongoing problems with agoraphobia. (Tr. at 30.) On evaluation with Dr. Pletcher in December 2003, plaintiff had only mild symptoms and a GAF of 62. (Tr. at 30-31.) Subsequent progress notes reflected a decrease in depressive symptoms with medication and therapy. While plaintiff did continue to manifest symptoms of social phobia, more recent records also showed improvement with therapy, as she was able to go out to eat, attend church and school events on a regular basis. Plaintiff testified that she continued to have problems with panic attacks and social interaction, but she reported no problems getting along with family members, and the ALJ noted that she was able to interact appropriately at the hearing. (Tr. at 31.) The ALJ acknowledged Dr. Pletcher's report suggesting greater limitations, found it "not supported by the objective medical evidence of record." (Tr. at 31.) The ALJ noted that Dr. Pletcher had seen plaintiff on only fourteen occasions since 2003, which suggested that plaintiff's mental health issues were not as severe as alleged. Further, the ALJ found that the more recent treatment records showed an improvement in symptoms. Thus, while the ALJ acknowledged that plaintiff had some mental health limitations, they were not so severe as to preclude unskilled, simple work with no public contact and only occasional interaction with co-workers. (Tr. at 31.)

Finally, the ALJ acknowledged the reports of the state agency consultants finding that plaintiff's impairments did not meet or equal a Listing. The ALJ agreed with this conclusion but found plaintiff more limited than these reports specified. (Tr. at 31.)

Based on this RFC and relying on the VE, the ALJ found that plaintiff could not perform her past work as a postal clerk, postal carrier, mail handler and timekeeper supervisor, as all of these jobs were semi-skilled. (Tr. at 31.) However, again relying on the VE, the ALJ concluded at step five that plaintiff could perform other jobs, including officer worker and

35

messenger. Therefore, the ALJ found plaintiff not disabled and denied the application. (Tr. at 32-33.)

### III. DISCUSSION

Plaintiff argues that the ALJ erred in several respects in setting RFC, in evaluating the credibility of her testimony, and in reaching her step five conclusion based on the testimony of the VE. I address each argument in turn.

**A. RFC**

**1. Legal Standard**

As indicated above, RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8p. In determining RFC, the ALJ must produce a narrative discussion describing how the evidence supports her conclusions, citing specific medical facts and non-medical evidence. The ALJ must consider all limitations that arise from medically determinable impairments, even those that may not be severe, Villano v. Astrue, 556 F.3d 558, 563 (7th Cir. 2009), and must explain how she resolved any material inconsistencies or ambiguities in the evidence, SSR 96-8p.

The ALJ may not in determining RFC "play doctor" and make her own independent medical findings. See Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996). Rather, she must consider and address the medical source opinions of record, and if her RFC assessment conflicts with an opinion from a medical source explain why the opinion was not adopted. SSR 96-8p. Medical opinions from a treating physician (a/k/a "treating source") about the nature and severity of the claimant's impairments are entitled to "special significance" and will, if

36

well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, be given "controlling weight." SSR 96-8p. If the ALJ finds that a treating source opinion does not meet the standard for controlling weight, she must evaluate the opinion's weight by looking at the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(d); see also SSR 96-2p. Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always "give good reasons" for her decision. 20 C.F.R. § 404.1527(d)(2).

### 2. Analysis

Plaintiff attacks the ALJ's RFC finding on several grounds, arguing that the ALJ (1) failed to consider plaintiff's impairments in combination and selectively cited the record; (2) improperly rejected the findings of plaintiff's treating source, Dr. Pletcher; (3) erred in setting mental RFC; and (4) failed to include certain physical limitations in the RFC.

### a. Impairments in Combination

Plaintiff does not explain how the ALJ failed to consider her impairments in combination. As indicated above, the ALJ adopted a long list of severe impairments and included in the RFC limitations pertaining to the affected areas – back, right arm and mental ability for work. Further, while the ALJ may not select and discuss only that evidence which supports her conclusion, e.g., Herron, 19 F.3d at 333, the ALJ is not required to discuss every piece of evidence in the record, and the weight to be accorded any evidence rests within her discretion, Diaz v. Chater, 55 F.3d 300, 309 (7th Cir. 1995). Ultimately, the ALJ need only minimally

37

discuss contrary evidence, Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000), and build a logical bridge from the evidence to her conclusions, Simila v. Astrue, No. 07-3682, 2009 WL 2169207, at *10 (7th Cir. July 22, 2009); see also Walker v. Bowen, 834 F.2d 635, 643 (7th Cir. 1987) ("We do not require the ALJ to discuss every piece of evidence, but only to articulate his rationale sufficiently to allow meaningful review."). In the present case, the ALJ produced a fourteen-page, single-spaced opinion, which discussed the evidence of record in some detail.

### b.    Dr. Pletcher's Report

Plaintiff's first specific argument is that the ALJ erred in discounting Dr. Pletcher's report. In so doing, the ALJ relied in part on the fact that plaintiff saw Dr. Pletcher just fourteen times over a several year period. Plaintiff contends that the record contains little support for the notion that this frequency of visits suggests a lesser degree of limitation. At the same time she saw Dr. Pletcher for medication management, plaintiff obtained therapy from a VA psychologist, Dr. Cornette, on a near monthly basis. While frequency of visits is a relevant factor in evaluating a medical opinion, if this had been the only reason given by the ALJ remand might be required. See, e.g., Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1096 (E.D. Wis. 2001) (stating that, in the absence of evidence concerning how regularly a patient with the plaintiff's condition would be expected to see a doctor, the ALJ should not have made his own independent medical determination about the frequency of doctor visits).

However, the ALJ also explained that the report was contrary to the other evidence of record, including Dr. Pletcher's own treatment notes. When plaintiff first saw Dr. Pletcher in December 2003, the doctor set a GAF of 62, indicative of mild symptoms and impairment in functioning (Tr. at 28; 324), and subsequent notes demonstrated an improvement in plaintiff's conditions with treatment. For example, during her July 19, 2005 visit to Dr. Pletcher, plaintiff

38

reported doing better, feeling calmer and less reactive to situations, and having flown out of town for a funeral and taking her kids to Wisconsin Dells, without problems. (Tr. at 28; 450-51.) During her July 18, 2006 visit with Dr. Cornette, plaintiff noted that she had attended church and her children's school functions. She expressed contentment at her financial situation, having received retirement benefits, and indicated that she preferred not to work. (Tr. at 28; 630-31.) In March and May 2007, plaintiff reported going out to dinner with family and attending church and school functions. (Tr. at 28; 591; 594-95.) Given this evidence, which suggested mild symptoms at the outset of treatment and a decrease in depressive symptoms and improved ability to go out and interact with others following treatment (Tr. at 30-31),[10] the ALJ reasonably rejected the very severe limitations set forth in Dr. Pletcher's report. See Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence."); Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) (finding that ALJ properly discounted medical opinion of treating physician because his "own office records did not support his later expressed opinion that [the] plaintiff was totally disabled").[11]

Plaintiff accuses the ALJ of misrepresenting the record, and she discusses certain evidence that lends support to Dr. Pletcher's report. But this is little more than a suggestion that I re-weigh the evidence.[12] See Books v. Chater, 91 F.3d 972, 978 (7th Cir. 1996) ("[S]o

---

[10]The ALJ also noted that plaintiff was able to interact appropriately at the hearing. (Tr. at 31.)

[11]The ALJ also cited the opinions of the state agency consultants, who concluded that plaintiff did not suffer from a mental impairment of Listing level severity. (Tr. at 31.)

[12]The ALJ did not ignore an entire line of evidence contrary to her decision, which would be grounds for remand. See, e.g., Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001). She

39

long as, in light of all the evidence, reasonable minds could differ concerning whether Books is disabled, we must affirm the ALJ's decision denying benefits."); Diaz, 55 F.3d at 305 ("We cannot substitute our own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled."); Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) ("'An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'") (quoting Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984)).  Plaintiff argues that five years of VA treatment notes support Dr. Pletcher's finding that plaintiff had a GAF of 50 and no useful ability to function in various work-related areas.  But plaintiff has no answer for the main point made by the ALJ – that plaintiff started treatment with a GAF of 62 and appeared to make progress, casting doubt on Dr. Pletcher's later GAF of 50 with restrictions precluding all work.[13]

Plaintiff argues that Dr. Pletcher's report is supported by the November 2006 VA finding of a service-connected disability.  The ALJ acknowledged this finding, but noted that the record did not contain the report of the relevant VA examination, and that subsequent progress notes reflected continued improvement.  (Tr. at 28.)  Further, as the Seventh Circuit has noted, the VA "requires less proof of disability than the Social Security Administration does."  Allord v. Barnhart, 455 F.3d 818, 820 (7th Cir. 2006).  Thus, while VA determinations should not be ignored, they are entitled only to "some weight" in a social security case.  Id.

---

acknowledged plaintiff's severe mental impairment and included appropriate restrictions in the RFC.

[13]Plaintiff relies heavily on her regular treatment with Dr. Cornette, but it is worth noting that Dr. Cornette refused to endorse plaintiff's disability application, stating that she did "not feel comfortable indicating [plaintiff] 'cannot work' secondary to mental health issues, though accommodation may be indicated."  (Tr. at 475.)

40

Finally, plaintiff argues that consultant Dr. Merrick's mental RFC report lends support to Dr. Pletcher's conclusions. Dr. Merrick found "moderate" limitations in several areas, primarily concerning the ability to manage detailed instructions, concentrate for extend periods and interact with supervisors and the general public. (Tr. at 542-43.) As noted above, the ALJ acknowledged the consultants' reports, and she accounted for these particular restrictions by limiting plaintiff to simple, unskilled work with no public contact and occasional interaction with co-workers. Further, as also noted earlier, Dr. Merrick found plaintiff not significantly limited in thirteen of twenty listed areas on the report, which does not reasonably support Dr. Pletcher's severe limitations.

### c.    Mental RFC

Plaintiff next argues that the ALJ failed to set forth specific mental limitations in the RFC and in her questions to the VE, instead purporting to tell the VE what type of work plaintiff could perform (i.e., unskilled, simple work with no public contact and only occasional interaction with co-workers). However, plaintiff cites no authority for the proposition that an ALJ may <u>never</u> express mental RFC in such a fashion. In <u>Lechner v. Barnhart</u>, 321 F. Supp. 2d 1015, 1036 (E.D. Wis. 2004), I noted that an ALJ's use of terms such as "simple," "repetitive" and "low stress" did not alone render an RFC determination invalid. I further noted that, unlike with physical RFC, SSR 96-8p contained no directive regarding the manner in which an ALJ may translate mental RFC into categories or otherwise express it in shorthand fashion. <u>Id.</u> at 1036 n.27; <u>see also</u> <u>Johansen v. Barnhart</u>, 314 F.3d 283, 288-89 (7th Cir. 2002) (holding that ALJ did not err in relying on a consultant's assessment of the claimant's mental RFC, where the consultant found the claimant "moderately limited" in several areas, then translated those findings into a specific RFC assessment, concluding that the claimant "could still perform

41

low-stress, repetitive work").

In the present case, the ALJ reviewed plaintiff's mental impairments under the B criteria, concluding that she had moderate restriction in activities of daily living; moderate difficulties in social functioning; mild difficulties in maintaining concentration, persistence and pace; and no episodes of decompensation, and thus did not meet a Listing. (Tr. at 23-24.) The ALJ then acknowledged that the limitations identified in the B criteria did not constitute an RFC assessment, and that the mental RFC assessment used at steps four and five required a more detailed assessment by itemizing various work-related functions. She then indicated that she had translated her findings into work-related functions in the RFC assessment. (Tr. at 24.)

As plaintiff notes, the mental RFC assessment should include consideration of the basic mental demands of work set forth in SSR 85-15, i.e.:

> the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15. Although the ALJ did not specifically evaluate these areas, any error is harmless. Aside from Dr. Pletcher's report, which the ALJ reasonably discounted, plaintiff is unable to point to any evidence of significant limitations in these areas. Plaintiff contends that state agency consultant Dr. Merrick found moderate limitations in these areas, but his report does not support the argument. As discussed above, Dr. Merrick found moderate limitations in plaintiff's ability to understand, remember and carry out detailed instructions; he found no significant limitation for simple instructions. (Tr. at 542.) While Dr. Merrick found moderate limitations in plaintiff's ability to interact with supervisors and the public (Tr. at 543), the ALJ

42

accounted for those limitations by limiting or excluding such interactions. Finally, Dr. Merrick found no significant limitation in plaintiff's ability to respond appropriately to changes in the work setting. (Tr. at 543.) Thus, plaintiff provides no reason to remand for further evaluation of mental RFC. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir.1989) ("No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Plaintiff also argues that the RFC does not account for her phobias and panic attacks, but she fails to explain how the ALJ erred in this regard. Plaintiff testified that her panic attacks were triggered by crowds and inappropriate behavior by others (Tr. at 718), and the ALJ included limitations addressing these problems. Aside from finding her precluded from all interaction (and thus precluded from work), it is unclear what more the ALJ should have done.

Finally, the cases plaintiff cites in support of her argument are distinguishable. In Young v. Barnhart, 362 F.3d 995, 1004 (7th Cir. 2004), the court remanded where the ALJ's RFC assessment and question to the VE failed to include limitations supported by medical reports the ALJ credited. No similar error has been shown here. The Young court did state, in a footnote, that the ALJ's hypothetical question, limiting the claimant to "simple, routine, repetitive, low stress work with limited contact with coworkers and limited contact with the public," was flawed in that it purported to tell the VE what types of work the claimant could perform rather than setting forth his limitations and allowing the expert to conclude on his own what types of work the claimant could perform. Id. at 1004 n.4. The court saw no need to consider whether this error was harmless because the hypothetical was flawed for other reasons, i.e. its omission of limitations credited by the ALJ. Any such error is harmless in this case; plaintiff points to no medical evidence credited by the ALJ suggesting greater limitations.

43

In <u>Kasarsky v. Barnhart</u>, 335 F.3d 539, 544 (7th Cir. 2003), the court likewise reversed where the hypothetical question failed to incorporate a mental limitation accepted by the ALJ. Again, nothing of the sort occurred in this case.

### d. Physical Limitations

Plaintiff next argues that the physical RFC, finding her capable of light work with frequent use of the right upper extremity, is not supported by substantial evidence. Plaintiff points to the x-rays and MRIs demonstrating lumbar and cervical degenerative joint disease, the EMGs revealing median neuropathy at both wrists, and the positive tests for carpal tunnel syndrome. The ALJ acknowledged this evidence but also noted that many of the tests revealed mild or minimal problems, and that plaintiff experienced some relief of her symptoms related to these conditions with treatment. (Tr. at 26-28.) The ALJ conducted a thorough review of the record, and I may not re-weigh the evidence or second guess the ALJ's reasonable evaluation of it.

Plaintiff argues that the ALJ based the RFC on Dr. Gozon's January 2007 discharge note, which indicated a complete resolution of symptoms after plaintiff's October 2006 auto accident. (Tr. at 28; 659.) Plaintiff argues that this refers only to the temporary symptoms she experienced after the accident, not her chronic conditions, and cites records showing that she later complained of pain. But as the ALJ noted, Dr. Gozon stated at the conclusion of treatment that plaintiff had no need for pain medications and had resumed activities of normal daily living without any problems. On exam, she displayed full and functional range of motion over the neck and upper extremities, mid and low back, and lower extremities with no pain, tenderness or discomfort in any of these areas. (Tr. at 659.) Thus, while it might be reasonable to construe this note as plaintiff does, it was also reasonable for the ALJ to construe it as undercutting plaintiff's claim. Further, the ALJ relied on other substantial

44

evidence in setting physical RFC, including records and a report from plaintiff's long-time treating physician, Dr. Boyle, and a functional capacity evaluation completed at the VA, both of which supported the notion that plaintiff could perform light work. (Tr. at 26; 30.) The ALJ also cited the reports of the state agency consultants, who found her capable of light work. (Tr. at 31.)

Finally, plaintiff argues that the ALJ cited no support for her finding that plaintiff could use her right hand frequently. She cites the records from Drs. Borca and Pulito showing pain, numbness and weakness; Dr. Pulito's ppd rating; and the finding of consultant Dr. Baumblatt limiting plaintiff to occasional use of the right arm. However, assuming the validity of the VE's testimony (an issue I address later), any error in expressing RFC in terms of "frequent" rather than "occasional" use of the right arm is harmless; indeed, it appears that the ALJ may have meant to so limit plaintiff.

When the ALJ initially asked the VE about positions for a person with the limitations set forth in the RFC, the VE answered mail clerk, general office worker and messenger. (Tr. at 739-40.) The ALJ then added the limitation of occasional use of the right upper extremity, and the VE stated that the officer worker and messenger positions could still be done but the mail clerk could not. (Tr. at 740.) In her step 5 decision, the ALJ listed only the officer worker and messenger positions. (Tr. at 32.) Thus, even if the ALJ erred in setting RFC for frequent use of the right arm, that error had no effect on the outcome; the jobs the ALJ relied on at step 5 require only occasional use of the right arm (according to the VE).

Plaintiff argues in her reply brief that I may not re-write the ALJ's RFC or accept the Commissioner's post-hoc modification of it. It is true that the reviewing court is limited to consideration of the reasons the ALJ gave, see, e.g., Steele v. Barnhart, 290 F.3d 936, 942

45

(7th Cir. 2002), but it is also true that the harmless error doctrine applies to social security appeals, see, e.g., Keys, 347 F.3d at 994. In light of the foregoing discussion (and again assuming the validity of the VE's testimony), any error in setting RFC for frequent rather than occasional use of the right arm is harmless. See Sanchez v. Barnhart, 467 F.3d 1081, 1082-83 (7th Cir. 2006) ("[I]n administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision.").[14]

**B.    Credibility**

**1.    Legal Standard**

Under SSR 96-7p, the ALJ must follow a two-step process in evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness. First, the ALJ must consider whether the claimant suffers from an impairment that could reasonably be expected to produce the symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work. Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which they limit the claimant's ability to work. If the claimant's statements are not fully substantiated by objective medical evidence, the ALJ must make a credibility finding based on an evaluation of the entire case record, considering in addition to the medical evidence the claimant's activities; the duration, frequency and intensity of the symptoms; precipitating and aggravating factors; treatment modalities, including medication and any side effects therefrom; and functional

---

[14]In her reply brief, plaintiff offers no reason why I should not find the error harmless in light of the VE's testimony and the ALJ's limitation of her step five decision to these two jobs. However, as discussed below, under the Dictionary of Occupational Titles and Selected Characteristics of Occupations, these two positions require frequent reaching, handling and fingering. I address the conflict in § C.2. of this decision.

46

limitations and restrictions.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  So long as the ALJ substantially complies with these requirements, the court must afford her credibility determination substantial deference, reversing only if it is patently wrong.  See Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003); see also Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008).

### 2.    Analysis

Plaintiff argues that the ALJ failed to make a proper finding under SSR 96-7p, but I cannot agree.  The ALJ acknowledged the two-step process set forth in the Ruling, including the requirement she make a finding based on the entire record at the second step.  (Tr. at 24-25.)  The ALJ then summarized the testimony and other evidence of record, concluding that while plaintiff's impairments could produce the symptoms alleged, plaintiff's statements about the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ALJ's RFC.  (Tr. at 29-30.)  The ALJ provided specific reasons for this conclusion over a page and a half of the decision, touching on the factors set forth in SSR 96-7p.  (Tr. at 30-31.)

Regarding plaintiff's complaints of pain and other physical limitations, the ALJ discussed the objective medical evidence, including x-rays and EMGs; the conservative treatment plaintiff received; the report from Dr. Boyle and functional capacity evaluation from the VA indicating that plaintiff could perform light work; the apparently normal examination findings by Dr. Gozon in January 2007; plaintiff's use of a TENS unit and braces for pain, with which she obtained good relief; her infrequent use of pain medication; and her ability to perform a number of household tasks on a regular basis without significant difficulty.  Based on this review, the ALJ accepted that while plaintiff had some limitations related to her physical problems, she could

47

perform a range of light work.  (Tr. at 30.)

Regarding plaintiff's mental health issues, the ALJ noted that Dr. Pletcher initially rated plaintiff's symptoms as mild, and the progress noted reflected a decrease in depressive symptoms and improved ability to go out and interact with others, despite social phobia.  (Tr. at 30-31.)  The ALJ further noted that plaintiff was able to get along with family members and interacted appropriately at the hearing.  Thus, while the ALJ again accepted that plaintiff had some mental health limitations, she concluded that plaintiff was not precluded from unskilled, simple work requiring no public contact and only occasional interaction with co-workers.  (Tr. at 31.)

Plaintiff notes that an ALJ may not rely solely on a lack of objective medical support in finding a claimant incredible, but the ALJ did not commit such an error here.   She acknowledged her duty to consider, and in fact considered, the entire record in making her finding.  Plaintiff attacks the ALJ's reliance on her "conservative treatment," noting that such was recommended after two surgeries, physical therapy and use of splints.  But the ALJ acknowledged all of this treatment, and there is nothing wrong with the ALJ's consideration of conservative treatment in evaluating credibility.  See, e.g., Sienkiewicz v. Barnhart, 409 F.3d 798, 804 (7th Cir. 2005) (finding that claimant's subjective complaints of disabling pain were not entirely credible where the claimant's treatment was "routine and conservative"); Caldarulo v. Bowen, 857 F.2d 410, 413-14 (7th Cir. 1988) (finding claimant's credibility was undermined where his conditions responded to conservative treatment).

Plaintiff argues that she explained at the hearing why she infrequently took strong pain medication – it caused side effects, so she used it only when experiencing very bad episodes of pain.  However, as the ALJ noted, the only side effects plaintiff complained of on initial

48

questioning were headaches if she skipped her daily medications. (Tr. at 25; 710-11.) She

testified that so long as she took those medications as prescribed, she was fine. (Tr. at 711.)

The testimony upon which plaintiff now relies, which came on further questioning from her

lawyer, is less than clear. After confirming that she took pain medication only when having a

severe problem, which occurred just two or three times per year, plaintiff stated: "I don't like

pain pills." (Tr. 724.) The following exchange then occurred:

> Q     Does – you just don't like them or they're –
>
> A     I don't like taking pills period. I don't like them. I take the Atotalac and the
> Busparil and the Meloxicam because I have to. For my depression, for my
> anxiety, I have to take that and we're monitoring it and we're working with it. The
> amprizol is for my stomach because I got acid reflux and lorazepam calms me
> down when I need it. Those I take because I have to. The rest of them I take
> only when it's so bad I can't take it anymore.
>
> Q     Okay. So it's just that you don't like the pain pills, you know, the side
> effects from them or anything.
>
> A     I don't like them at all. Some of them I get sick, too. I can't take them
> because they're too strong. Tylenol 3s are too strong. Something else they used
> to give me is too strong. I don't like them. I don't –
>
> Q     So if you're taking a pain [pill] that's too strong, what does it do to you?
>
> A     It flips my stomach until I throw up. I can't – I feel like I'm pregnant or
> something. I just get nauseous and I can't get out of bed for a couple of days
> until it either wears off or subsides, whatever you call it.

(Tr. 725.) This testimony does not fully support plaintiff's claim now that she "refrains from

taking daily pain medication because it causes nausea, vomiting and sedation." (Pl.'s Br. at

25.) It is unclear from the testimony whether any of her current pain medications caused such

effects, or whether those problems came from pills "they used to give" her. In any event, it was

not unreasonable for the ALJ to rely on plaintiff's earlier testimony that she took pain

medication only when she had to, and that her pain was severe enough to require use of pain

49

medication only two or three times per year.  (Tr. at 25.)

Plaintiff attacks the ALJ's reliance on her daily activities, citing circuit case-law warning ALJs from placing undue weight on such activities.  See, e.g., Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).  But as Mendez notes, "[s]ome weight is appropriate," id., and the ALJ listed plaintiff's activities as only one of many reasons for her conclusion.  Plaintiff notes her testimony that certain of her activities were limited, but as the ALJ stated, the discharge note from Dr. Gozon indicated that she had returned to daily activities without problem (Tr. at 30), and a function report plaintiff completed prior to the hearing suggested more significant activities (Tr. at 25).

Finally, plaintiff notes that substantial, objective medical evidence of record demonstrates that her subjective complaints could reasonably be produced by her impairments.  The ALJ did not find the contrary; she accepted at step one of the SSR 96-7p process that plaintiff's impairments could produce the symptoms.  However, she then determined at step two, based on a review of the entire record (not just the medical evidence), that plaintiff's allegations were not credible to the extent they suggested total disability.

C.     **Hypothetical Questions to and Reliance on the VE**

1.     **Legal Standard**

"If the ALJ relies on testimony from a vocational expert, the hypothetical question [s]he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record."  Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004).  "The reason for the rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations."

50

Steele, 290 F.3d at 942. However, this does not mean that the ALJ must include every limitation alleged by the claimant – only those supported by the evidence. See Ehrhart v. Sec'y of Health & Human Servs., 969 F.2d 534, 540 (7th Cir. 1992).

If the ALJ relies on VE testimony in making her decision, she also has an "affirmative responsibility" to ask whether the VE's evidence conflicts with information provided in the Dictionary of Occupational Titles ("DOT"), Overman v. Astrue, 546 F.3d 456, 462-63 (7th Cir. 2008) (citing SSR 00-4p), a publication from the Department of Labor containing standardized occupational information, see Donahue v. Barnhart, 279 F.3d 441, 445 (7th Cir. 2002). If a discrepancy appears, the ALJ may still rely on the VE's answers but must obtain "a reasonable explanation for the apparent conflict." Id. at 463 (quoting SSR 00-4p); see also id. at 464 ("An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's authors, Donahue, 279 F.3d at 446, or when the VE's contrary testimony is based on information in 'other reliable publications,' SSR 00-4p."); Donahue, 279 F.3d 446 (stating that the ALJ "must be entitled to accept testimony of a vocational expert whose experience and knowledge in a given situation exceeds that of the Dictionary's authors").

**2.    Analysis**

Relying on her previous argument that the ALJ's RFC was incomplete and unsupported by substantial evidence, plaintiff argues that the hypothetical question to the VE based thereon was flawed. For the reasons stated earlier, the argument fails. Plaintiff notes that the VE was able to identify only one job requiring occasional use of both hands, and the ALJ did not find that plaintiff could perform that job. But plaintiff does not even attempt to show that the ALJ erred in failing to adopt such a limitation for both arms. This is not a case like Samuel v.

51

Barnhart, 295 F. Supp. 2d 926, 957 (E.D. Wis. 2003), or Young and Kasarsky, discussed above, where the ALJ's hypothetical failed to include restrictions contained in a medical report the ALJ credited. Nor was the ALJ's formulation of the question harmful error.

However, plaintiff's final argument – that the ALJ failed to reconcile potential conflicts between the VE's testimony and the DOT – has traction. Plaintiff contends that the jobs identified by the VE are at odds with the RFC for simple, unskilled work involving no public contact and only occasional interaction with co-workers. On review of the job requirements listed in the DOT and its companion volume, the Selected Characteristics of Occupations ("SCO"), and the relevant case-law, there may be a conflict. And because the ALJ refused to permit plaintiff's counsel to fully explore the issue at the administrative level, the matter must now be remanded.

At the hearing, the ALJ prefaced her questions to the VE by stating: "I'll assume your testimony is consistent with the Dictionary of Occupational Titles. If not, please so indicate." (Tr. at 737.) Perhaps this satisfied the ALJ's initial duty of inquiry, see Overman, 546 F.3d at 463, but on cross examination plaintiff's counsel sought to expose conflicts with the DOT. Counsel asked whether the messenger and office worker jobs the VE identified could, under the DOT, be performed with only occasional reaching, handling and fingering; the VE said she did not know without "looking it up."[15] (Tr. at 741.) Later, counsel asked the VE to provide DOT codes, and the VE stated that she could get them and send them to counsel, but the ALJ

_____

[15]If she had looked it up, the VE would have seen that, according to the SCO, the job requires "frequent" reaching, handling and fingering. SCO at 348. The VE testified that in her experience the jobs did not require more than occasional use of the hands. (Tr. at 741.) I need not decide whether this is a sufficient explanation of the conflict because the VE offered no explanation for the additional conflict about which plaintiff now complains, and which I discuss later in the text.

52

stated: "No, I don't think we're going to be doing anything . . . after the hearing sending those." (Tr. at 744.) Thus, counsel made an effort to explore possible conflicts with the DOT but was prevented from doing so. This is not a case like <u>Donahue</u>, where counsel failed to question the VE's foundation or reasoning, thus permitting the ALJ to rely on the VE's bottom line opinion. 279 F.3d at 446-47. And as the Seventh Circuit held in <u>McKinnie v. Barnhart</u>, 368 F.3d 907, 911 (7th Cir. 2004), the data and reasoning underlying an expert's opinion must be "available on demand." <u>See also</u> <u>Hofer v. Astrue</u>, 588 F. Supp. 2d 952, 967 (W.D. Wis. 2008) (noting that a "lawyer who wants to cross-check the job titles cited by a vocational expert against the descriptions set forth in the Dictionary is free to ask the expert to provide the relevant Dictionary citations; if the expert refuses to provide this information, the result is likely to be a remand").

In this court, plaintiff contends (and the Commissioner does not dispute) that the positions identified by the VE correspond to DOT # 239.567-010,[16] which, according to the SCO, requires performing a "variety of duties," including speaking and signaling to people. The Commissioner notes that this position has an "SVP" (special vocational preparation) of 2,[17] which is the equivalent of unskilled work, <u>see</u> SSR 00-4p (stating that "unskilled work corresponds to an SVP of 1-2"), and which the regulations further describe as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period

---

[16]<u>See</u> http://www.occupationalinfo.org/23/239567010.html.

[17]Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. A job with an SVP level of 1 requires a short demonstration only. SVP level 2 involves anything beyond short a demonstration up to and including one month. <u>See</u> http://www.occupationalinfo.org/appendxc_1.html#II.

of time," 20 C.F.R. § 404.1568(a). However, plaintiff does not argue that the job is "skilled"; rather, she argues that it is not "simple," as required by the ALJ's RFC. See Meissl v. Barnhart, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005) ("The problem for the Commissioner is that she is conflating two separate vocational considerations. Other courts decided that, contrary to the Commissioner's argument here, the SVP level in a DOT listing indicating unskilled work, does not address whether a job entails only simple, repetitive tasks.").

In support of her argument, plaintiff notes that according to the DOT this job has a "Reasoning Development Level" of 2, which requires the worker to be able to apply commonsense understanding to carry out "detailed but uninvolved" written and oral instructions.[18] Courts are divided on whether a limitation to "simple, routine" work, such as the ALJ imposed in the present case (Tr. at 739), is consistent with the ability to follow "detailed but uninvolved" instructions. Compare Simms v. Astrue, 599 F. Supp. 2d 988, 1007-08 (N.D. Ind. 2009) (holding that jobs requiring a reasoning level of 2 exceeded the plaintiff's limitation to "simple" tasks, and collecting cases in accord); Leonard v. Astrue, 487 F. Supp. 2d 1333, 1343 (M.D. Fla. 2007) (collecting cases ordering remand, pursuant to SSR 00-4p, "based upon

_____

[18]Reasoning Development is part of a broader category called "General Educational Development," which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. . . . The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development." Level 1 Reasoning Development requires the employee to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or from these situations." Level 2 requires the employee to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations." See http://www.occupationalinfo.org/appendxc_1.html#III. As the court explained in Meissl, 403 F. Supp. 2d at 983, reasoning level, rather than SVP, is the more appropriate measure of whether a job qualifies as "simple" or "routine."

the ALJ's failure to elicit a reasonable explanation from a VE regarding an apparent conflict between the VE's testimony that a plaintiff, who was limited to performing simple and repetitive tasks, could perform a job that the DOT classified as either requiring a reasoning level of two or three"); Spearing v. Astrue, No. 07-138-B-W, 2008 WL 2593790, at *3-4 (D. Me. Jun. 30, 2008), adopted, 2008 WL 2858813 (D. Me. Jul. 22, 2008) (remanding based on apparent conflict with the DOT); Flagg v. Barnhart, No. 04-45-B-W, 2004 WL 2677208, at *5 (D. Me. Nov. 24, 2004). adopted, 2004 WL 2861756 (D. Me. Dec. 14, 2004) (stating that "a claimant limited to the performance of jobs entailing only simple instructions . . . would be incapable of performing any of the jobs identified by [the VE], all of which have General Educational Development ('GED') reasoning levels of 2 or 3"); Mead v. Barnhart, No. Civ.04-139-JD, 2004 WL 2580744, at *2 (D.N.H. Nov. 15, 2004) (noting that courts have decided that the SVP level in a DOT listing, indicating unskilled work, does not address whether a job entails only simple, repetitive tasks, and concluding that "a 'GED' reasoning level of 2, or higher, assumes that the applicant is capable of more than simple or repetitive tasks"); Allen v. Barnhart, No. C-02-3315, 2003 WL 22159050, at *11 (N.D. Cal. Aug. 28, 2003) (concluding that jobs with reasoning level of 2 exceeded the ALJ's limitation of plaintiff to "simple, routine tasks"); with Burnette v. Astrue, No. 2:08-CV-009-FL, 2009 WL 863372, at *5 (E.D.N.C. Mar. 24 2009) (collecting cases finding reasoning level 2 consistent with RFC for simple work); Squier v. Astrue, No. EDCV 06-1324-RC, 2008 WL 2537129, at *5 (C.D. Cal. Jun. 24, 2008) ("Plaintiff's limitation to simple, repetitive tasks is not inconsistent with the ability to perform jobs with a reasoning level of two."); Jones v. Astrue, 570 F. Supp. 2d 708, 716 (E.D. Pa. 2007), aff'd, 275 Fed. Appx. 166 (3rd Cir. 2008) (collecting cases holding that working at reasoning level 2 would not contradict the mandate that the work be simple, routine and repetitive); Meissl, 403 F. Supp. 2d at 984

55

(explaining that social security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories – "short and simple instructions" and "detailed" or "complex" instructions – while the DOT employs a much more graduated, measured and finely tuned scale, and that it would be inappropriate to conclude that all jobs with a reasoning level of two or higher would be considered "detailed" under the regulations); Flaherty v. Halter, 182 F. Supp. 2d 824, 850-51 (D. Minn. 2001) (finding limitation to simple, routine, repetitive, concrete, tangible tasks, not inconsistent with level two reasoning, and relying on the caveat in the DOT that the instructions be detailed but "uninvolved," which does not suggest "a high level of reasoning").

Because the ALJ improperly short-circuited the inquiry in this case, leaving unresolved two potential conflicts with the DOT ("frequent" v. "occasional" use of the hand, and a limitation to "simple, routine" work in a reasoning development level 2 job),[19] I need not choose a side in this debate. Rather, it seems most appropriate to remand the matter for further proceedings on this issue. See Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) (remanding to obtain VE testimony to determine whether a claimant limited to following only simple instructions could engage in unskilled sedentary work when many jobs in that category require reasoning at level two or higher); Clarendon v. Astrue, No. ED CV 07-1520-E, 2008 WL 2561894, at*2 (C.D. Cal. Jun. 26, 2008) ("Given this lack of clarity, at a minimum the ALJ erred in failing to inquire through a vocational expert into the possible inconsistency between a restriction to simple

---

[19]On remand, the ALJ should also determine whether the DOT/SCO job requirement that the employee speak or signal to people is consistent with an RFC for no public contact and occasional co-worker interaction and, if not, obtain an appropriate explanation.

56

instructions and an aptitude sufficient to understand detailed but uninvolved instructions.").[20]

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 21st day of August, 2009.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[20]As the <u>Meissl</u> court noted, reasoning level 1 jobs include things like counting cows as they come off a truck, pasting labels on filled whiskey bottles, and tapping the lid of cans with a stick. Many people limited to "simple, routine" work can likely do more than that. 403 F. Supp. 2d at 984. Thus, I see no reason why, categorically, a person so limited could not perform a reasoning level 2 job. The problem here is that neither the VE or the ALJ provided any explanation of the potential conflicts between plaintiff's RFC and the DOT characteristics of this position. This explanation could consist of a more detailed RFC from the ALJ, which makes clear(er) that the person can handle "detailed but uninvolved" instructions, i.e. more than simple one- and two-step instructions, or an acceptable statement from the VE that, based on her experience, a person so limited could perform the identified jobs.

57